EL PUEBLO, DEMANDANTE Y APELADO, *v.* RODRÍGUEZ ET AL., ACUSADOS Y APELANTES.

APELACIÓN procedente de la Corte de Distrito de San Juan, Distrito Segundo, en causa por libelo infamatorio.

No. 1880.—Resuelto en abril 9, 1923.

LIBELO—COMUNICACIÓN CONDICIONALMENTE PRIVILEGIADA.—Se imputó a los acusados en este caso el delito de libelo por haber difamado maliciosamente al Juez Municipal de Bayamón al dirigir 'al Dr. Barbosa, de San Juan, el siguiente telegrama: ''Juez Municipal cerró colegio inscripciones y rehusó permitir inscripción electores republicanos. Momentos después volvió abrirlo inscribir electores unionistas. Parcialidad manifiesta. Urge investigación hechos. Pueblo indignado, protesta.'' *Se resolvió:* fundándose el tribunal en el resultado de la prueba, que los acusados fueron más allá de lo que debieron en sus imputaciones, pero habiéndose basado su actitud en un acto aparentemente ilegal, aunque no delictivo, del juez municipal, presidente de la junta de elecciones, tratándose de una cuestión de interés público, habiendo actuado en una capacidad representativa y dirigídose exclusivamente a una persona que tenía esa misma capacidad en una esfera mayor y al oficial público a quien estaba encomendada la superintendencia de las elecciones en toda la isla, su comunicación debe entenderse condicionalmente privilegiada.

Los hechos están expresados en la opinión.

Abogados de los apelantes: *Sres A. P. Rodríguez* y *L. Feliú.*

Abogado del apelado: *Sr. José E. Figueras, Fiscal.*

EL JUEZ PRESIDENTE SR. DEL TORO, emitió la opinión del tribunal.

Se trata de un caso de libelo infamatorio. La acusación, en lo pertinente, dice así:

"Los citados acusados Artemio P. Rodríguez, A. Acevedo y Genaro Cotto, como autores, en Bayamón dentro de este distrito judicial municipal, allá por el día 28 de mayo de 1920, ilegal, voluntaria y maliciosamente publicaron e hicieron publicar un telegrama dirigido al Dr. Barbosa, de San Juan, y en el cual se expresan las siguientes difamaciones maliciosas: 'Juez Municipal cerró colegio inscripciones y rehusó permitir inscripción electores republicanos. Momentos después volvió abrirlo inscribir electores unionistas. Parcialidad manifiesta. Urge investigación hechos. Pueblo indignado protesta.' Este telegrama, conteniendo las difamaciones maliciosas que se han transcrito, circuló en la fecha y sitios indicados, refiriéndose dichas difamaciones al Hon. Juez Municipal de Bayamón, Ernesto Díaz Arana, cuya honradez, virtud, integridad y buena fama tienden a impugnar, exponiéndole así al odio, desprecio y ridículo públicos."

Los acusados alegaron varias excepciones que fueron desestimadas, y celebrada finalmente la vista, la corte los condenó como autores del delito que se les imputaba a pagar una multa de veinticinco dólares y en defecto de pago a sufrir un día de cárcel por cada dolar dejado de satisfacer. No conformes con la sentencia, apelaron de ella para ante este tribunal señalando la comisión de diez y ocho errores.

No discutiremos todos los errores señalados. Daremos por sentado que la acusación imputa la comisión de un delito público y que los acusados no tenían derecho a un juicio por jurado, de acuerdo con la jurisprudencia establecida por esta corte en *Ex parte Bird,* 5 D. P. R. 247, 258, limitando nuestro estudio a la prueba y a la ley y jurisprudencia aplicables de acuerdo con el resultado de la misma.

La práctica de la evidencia en el acto del juicio comenzó por la del fiscal, consistente en el telegrama transcrito en la acusación y el periódico *El Tiempo* en que fué publicado.

Declarada sin lugar una moción de *nonsuit,* introdujeron los acusados su prueba y finalmente el fiscal presentó las declaraciones de tres testigos.

Archivaron en primer término los acusados la copia de otro telegrama, igual al transcrito en la acusación, dirigido al Superintendende de Elecciones. La investigación solicitada se llevó a efecto y se archivó también como prueba el informe rendido al Attorney General por el fiscal *at large* Sr. Rivera Zayas, que fué el encargado de practicarla. Dicho informe contiene una detallada exposición del procedimiento seguido y de la prueba practicada y termina así:

"Mi conclusión es que no se ha sustanciado el cargo que se le hizo al Juez Municipal de Bayamón en su calidad de Presidente de la Junta Local de Elecciones acerca de que había obstaculizado la inscripción de electores republicanos.—No hay duda de que se colocó un rastrillo antes de las seis de la tarde; pero no se ha demostrado que la colocación de ese rastrillo se hiciera con el objeto de no inscribir más electores puesto que por el contrario, al ponerse el rastrillo, había diez electores dentro del local inscribiéndose.—Mi recomendación es que se prohiba la práctica de colocar ese rastrillo, pero de cualquier modo la puerta del Colegio de inscripciones debe estar siempre franca y así se evitarán incidentes como el que nos ocupa; pero esto está dentro de la jurisdicción del Superintendente de Elecciones, que es el que tiene a su cargo la inscripción y, reglamentación de los trabajos de las Juntas Locales de Inscripciones, y, asimismo recomiendo que se le envíe copia de este informe y del récord de la investigación practicada al Superintendente General de Elecciones para que éste tenga la oportunidad de examinar la prueba practicada y determinar lo que más estime conveniente a los intereses públicos."

Acto seguido declararon como testigos Artemio P. Rodríguez, acusado, Francisco Baldorioty y Andrés Avelino Escalera. Las declaraciones son largas y difíciles de sintetizar. Transcribiremos de ellas la parte que nos parece apropiada para dar una idea de lo sostenido por cada testigo.

El primero se expresó así:

"* * *; que cuando se transmitió el documento letra 'A' de la prueba del Fiscal, o sea un telegrama dirigido al Dr. Barbosa y firmado por él, A. Acevedo y Genaro Cotto, desempeñaba el declarante el cargo de Presidente del Comité Local Republicano en el poblado de Cataño; que como tal Presidente eran sus deberes atender en todo lo que se relacionara con la inscripción de los electores republicanos del poblado de Cataño, y ocuparse en general de todos los asuntos del partido en la localidad; * * *; que los otros dos acusados eran inspectores en las inscripciones por el Comité Local; * * *; que el día 28 de mayo estuvo allí; que serían como las cinco o cinco y pico, no pudiendo precisar hora exacta, acudió al sitio donde se verificaban las inscripciones llevando unos electores republicanos que entraron a inscribirse; que se quedó fuera y momentos después la junta local dió por cerradas las inscripciones y pusieron en la puerta de entrada al local un rastrillo, que se colocaba en todos los días de inscripciones, cuando éstas se daban por terminadas; que al ver esto preguntó al policía de la puerta, si se había cerrado y le contestó que sí; que después de eso llegaron unos electores republicanos a inscribirse, los que sabía eran republicanos porque venían con corredores republicanos puestos a ese fin * * *; que estos electores se encontraron que ya estaba cerrada la inscripción y no pudieron inscribirse, no fueron aceptados al local; que entonces entró como de costumbre al colegio de inscripciones para tomar la nota oficial de las personas que se habían inscrito; que se acercó a la mesa del juez de paz que era quien llevaba esa nota, a tomarla; que estando tomando la nota sintió un alboroto en la parte afuera y oía voces de que 'ese es de Pueblo Viejo'; que al oir esto se asomó y a la sazón venía el Dr. Figueroa con unos electores para inscribirlos; que le dijeron que estaba cerrado; que entonces el Dr. Figueroa desde fuera del rastrillo el Dr. Figueroa sacó su reloj y con él en la mano alegaba que no era la hora de cerrar, que no podía estar cerrado porque no era la hora; que entonces el declarante llamó la atención al Sr. Díaz Arana de que él había cerrado el colegio para los republicanos y no debía abrirlo para los otros del Dr. Figueroa; que entonces el Dr. Figueroa pidió permiso para entrar y dió la vuelta y entró por la puerta por donde salían los electores ya inscriptos; que argumentaban el caso adentro y cuando el declarante llamaba la atención al señor Díaz Arana de que los electores republicanos no habían sido inscritos, éste le dijo 'sí, pero Uds. no alegaron esto, o no protestaron o no alegaron, mientras que estos pro-

testan y reclaman su derecho, y como no son las seis, pues, yo tengo que abrir; * * *; que en eso el declarante salió del local, fué a la oficina del Comité, hizo investigaciones y de allí salieron para la oficina del telégrafo a poner el telegrama; que ese telegrama era al Dr. Barbosa; que el Dr. Barbosa cuando se mandó este telegrama era Consejero del Partido Republicano y residía en San Juan; * * *; y además el Dr. Barbosa es el líder más prominente del partido, a quien todos miran en casos de emergencia, * * *"

El testigo Baldorioty, dijo:

"Que el 28 de mayo estaba en el Colegio de Inscripciones de Cataño, como identificador y recusador del partido republicano; que cuando se dieron por terminadas las inscripciones estaba dentro del colegio; que serían las cinco y veinticinco de la tarde de ese día, cuando el Presidente del colegio ordenó que se cerrara porque el número que había dentro era suficiente para terminar las inscripciones de aquel día; que él protestó inmediatamente diciendo que eran las 5:25 y que los colegios debían cerrarse a las seis, y que había electores republicanos para inscribirse; que se puso el rastrillo como de costumbre y se quedaron los individuos adentro nada más que para continuar las inscripciones; que el Lcdo. Artemio P. Rodríguez estuvo esa tarde en el colegio como de costumbre, cuando se cerraba el colegio para recoger la nota de los electores que se inscribían en el día; * * *; que después de cerradas las inscripciones esa tarde, el Dr. Figueroa vino con un elector para hacerlo inscribir se le llamó la atención de que el colegio estaba cerrado; que el Dr. Figueroa quería entrar por la puerta donde se ponía el rastrillo como indicación de que las inscripciones estaban cerradas y solicitó permiso del presidente, y el presidente le dijo que entrara por la puerta de salida, y se llevó a efecto y se inscribió el elector después; que se inscribió uno y uno republicano; que ese rastrillo se ponía todos los días cuando terminaban las inscripciones, e indicaba que ya se cerraba y no había más inscripción; que después de puesto el rastrillo vió llegar a la puerta unos electores a inscribirse, uno de ellos de apellido Alma; que eran republicanos; que esos electores no se inscribieron; que eran como dos o tres, un tal Camacho, Palenque, ese se inscribió; que llegaron después de puesto el rastrillo y no se inscribieron; que el elector que llevaba el Dr. Figueroa se inscribió porque hubo una discusión, el Dr. Figueroa alegaba que no eran las seis; * * *"

El testigo Escalera corrobora las declaraciones de Rodríguez y Baldorioty.

La prueba de *rebuttal* consistió como hemos dicho, en las declaraciones de tres testigos: el juez Arana, el secretario Bas y el Dr. Figueroa.

El primero, dijo:

"Que aquel día el colegio en Cataño se cerró a las seis en punto; * * * ; como a las seis menos veinte más o menos vinieron diferentes grupos de electores; a virtud de que nunca hubo fila directa, claro es que el policía se preocupa muy poco de la vigilancia de la puerta de entrada, y como tenía también que voltear el colegio para vigilar también la puerta de salida y los alrededores, por efecto de la ley en cuanto a los cien metros, los electores iban entrando indistintamente; que distraído como estaba el declarante con el movimiento de electores, y con el cansancio de no haber electores, con ambas cosas, no me dí cuenta, y cuando vine a ver en las dos mesas, únicas que tenía establecidas la Junta de Inscripciones para hacer la inscripción, había un número fuerte de electores, diez y seis o veinte más o menos; que desde luego, entendió, que en ese momento, si se admitían más electores, si entraban más entorpecerían la inscripción, y fué siempre su ánimo que la inscripción marchase lo más ordenadamente posible; que a tal fin dió orden al Sr. Bas * * * que tomase el rastrillo que había allí y lo recostase de la puerta, con el fin de impedir que pudiese haber entrada mayor de electores en tanto se iban desocupando las mesas, a fin de que pudieran inscribirse los que quedaban en fila; que el señor Bas recostó el rastrillo en la puerta, pero dejando un pequeño intermedio nunca cerrado, ni nunca se utilizó el rastrillo para cerrar el colegio, solamente ese día por esa circunstancia que acaba de explicar; que a ese tiempo llegó también el Dr. Figueroa por la puerta de entrada en unión de otros electores y también le parece que el Sr. Rodríguez, no está seguro, con uno o dos electores del partido republicano; que no pudieron entrar porque estaba el colegio sumamente lleno, pero tan pronto se fueron desocupando las mesas entonces entraron ellos e inscribieron sus electores; que en ningún momento dejó de haber la inscripción; que a nadie se le negó en absoluto en todo el día ni en ningún día en todos los precintos de Bayamón, la inscripción a ningún elector; que todos los que estuvieron allí se inscribieron; que a ese tiempo en que ocurría el caso que acaba de relatar, llegó el Sr. Rodríguez por la puerta de salida de electores, preguntó si estaba ce-

rrado el colegio, el declarante lo mandó a pasar y demás, y entonces el declarante le dijo 'no, no está cerrado el colegio, puesto que no son las seis; que simultáneamente sacó su reloj, miró el reloj que estaba en el parque, con el cual marchaba, y el señor Rodríguez sacó también su reloj, que no abandonó nunca en los de inscripciones, como líder político, que lo necesitaba, y vió que efectivamente yo le decía la verdad; que entonces el Sr. Rodríguez le manifestó que sus electores se habían ido, y el declarante sonriéndose le dijo 'no he visto ningún elector aquí, los que están a la puerta han entrado y los que están dentro se están inscribiendo; que el Sr. Rodríguez dijo 'Yo protestaré de este acto' y el declarante contestó 'Puede Ud. hacer lo que quiera'; que Rodríguez se fué y terminó el asunto; que no se le rehusó la inscripción a ningún elector republicano.''

El segundo, manifestó:

''Que se llama José Bas Aguilar y es Secretario de la Corte Municipal de Bayamón; lo era en 28 de mayo del 20; estaba en Cataño ese día, con motivo de las inscripciones para electores; que ese día el colegio se cerró a la hora de costumbre, a las seis de la tarde; que el Juez Díaz Arana no ordenó el cierre del colegio antes de las seis; que se inscribieron todos los electores que comparecieron ante la Junta, que el Juez Díaz Arana no se negó a inscribir ningún elector republicano; que vió allí al Ledo. Artemio P. Rodríguez; que allá como a las cinco y media o seis menos cuarto, o menos veinte, ya próximo a cerrarse el colegio, hubo una pequeña alteración de la paz allí, se puede decir; que había en el colegio cierto número de electores por inscribirse, y para que no entraran más electores hasta que no terminaran los que estaban dentro, se me ordenó a mí que cogiera el rastrillo que daba acceso a la entrada por donde entraban los electores a inscribirse para que lo pusiera allí hasta tanto se terminaba de inscribir aquellos para que entraran luego otros; que después de estar el rastrillo puesto, traían un elector de Pueblo Viejo, y se formó allí algo porque la gente decía que no era elector de allí, pero no obstante ese siempre se inscribió; que cuando se recostó el rastrillo cree entraron dos o tres electores más unionistas y republicanos también, y se inscribieron todos; que después de recostado el rastrillo no llegó ningún elector republicano que el Juez Díaz Arana o alguien de la Junta le negara su inscripción.  *  *  *. Que esa pequeña alteración de la paz que dice hubo allí fué que un elector republicano que traían y no era elector allí, lo traían de Pueblo Viejo los unionistas; que sabe que no era elector de allí

porque los mismos unionistas decían 'a ese no le dejen entrar que ese es de Pueblo Viejo, no es elector de aquí'; que él era entonces casualmente el que estaba en el rastrillo, y le decía a los unionistas 'pero que se inscriba y entonces lo recusan, si no tiene la residencia legal se puede recusar'; que en eso tuvo intervención don Artemio P. Rodríguez, era quien traía el elector ese a inscribirse, por la tarde como a las cinco y media, cuando ya el rastrillo estaba puesto; que don Artemio P. Rodríguez no entró al colegio cuando entró el elector, él entró después, muy bravo por cierto, y decía que aquello eran abusos, que se iba a quejar, que no se permitía que se inscribieran los electores republicanos; que él entró cuando decía eso por la puerta de enfrente, a la carretera, porque los electores entraban por otra puerta que da al callejón;     *   *   *''

El Dr. Figueroa, manifestó:

''Que vió las actuaciones del presidente de la junta, el Sr. Díaz Arana, de cinco a seis; que durante ese tiempo se inscribieron todos los electores que se presentaron al colegio; que a ningún elector se le negó el derecho de inscribirse; que llevó a inscribirse electores en distintas ocasiones; que de cinco a seis de la tarde llevó electores a inscribirse y después de las cinco y media de la tarde había electores dentro del colegio, practicándose la inscripción, y con posterioridad a esos electores que llevó a esa hora, también fueron inscritos electores republicanos, cuyos nombres no recuerda.—Repreguntado: Que entre cinco y media de la tarde y seis, más exactamente, las seis menos veinte, trajo unos electores a inscribirse; que esos electores los trajo desde su casa donde los tenía guardados para ganar con ellos la inscripción del día, que estaba a una distancia del colegio como media cuadra; que él personalmente los trajo; que él los fué a buscar a su casa; que él entró al colegio por un sitio y los electores por otro; que él entró por la puerta que da a la carretera y los electores por donde entraban éstos, por donde se acostumbraban poner en fila los electores.     *   *   *     Que no entró por la puerta de entrada al colegio porque cuando llegó con sus electores había cerca de la puerta por donde entraban a inscribirse los electores, un rastrillo aproximado a la puerta, no un rastrillo que cerrase por completo la entrada, pero sí recostado a la puerta; entonces cuando los puso en fila, el representante del partido de su señoría, me dijo que el colegio estaba cerrado; que entonces él sacó su reloj y dijo: 'no puede estar cerrado el colegio puesto que son las seis menos veinte' y se dirigió desde la puerta del colegio al Presidente pidién-

dole permiso para entrar al colegio a ver qué hora tenía el reloj del colegio a ver si estaba de acuerdo con el de él, puesto que él entendía que eran las seis menos cuarto, digo, menos veinte y no podía cerrarse el colegio puesto que la ley dispone que deben cerrarse a las seis; entonces el Presidente del colegio le autorizó a que pasara y ha dado la vuelta y entrado por la puerta que daba a la carretera, o sea a la parte sur del colegio; entonces vió la hora que era y le dijo al Juez 'se me dice que el colegio está cerrado, yo tengo por norma los días de inscripciones poner mi reloj a las siete de la mañana de acuerdo con el del colegio, mi reloj tiene las seis menos veinte, el reloj del colegio tiene las seis menos veinte y el de su señoría tiene las seis menos veinte' y le dije 'no el colegio no está cerrado, lo que pasa es que hay gente dentro del colegio; que entonces sus electores se quedaron esperando en fila y a su debida oportunidad entraron como entró un elector que recuerdo llevó el tío de su señoría (Lcdo. Rodríguez), que fué inscrito. ＊ ＊ ＊''

Al introducir su evidencia los acusados dijeron:

''Esa prueba se presenta para sostener la defensa que van a hacer estos acusados; primero, de justificación, y segundo, de privilegio. Descansamos nuestra defensa en estas dos cuestiones: Que este es un caso en el cual las imputaciones son ciertas, y en segundo lugar, que esta es una comunicación privilegiada.''

En cuanto al primer extremo, la misma ley, artículo 246 del Código Penal, dice que ''en todos los procesos promovidos por libelo se podrá testificar la verdad ante el tribunal o jurado y si éste estimare ser cierto lo denunciado como infamatorio, y haberse publicado con sana intención y para fines justificables, deberá absolverse libremente al acusado.'' Necesítase, pues, además de la demostración de la verdad, que la publicación se haya hecho con sana intención y para fines justos.

En cuanto al segundo extremo, la luz que debe guiarnos está contenida en gran número de decisiones de los tribunales. Rulling Case Law la condensa así:

''Una publicación es condicionalmente privilegiada cuando existen, o el demandado tiene motivos razonables para creer que existen, circunstancias que le imponen el deber de hacer una comunicación

a determinada persona, y la hace en cumplimiento de dicho deber, o cuando la persona está colocada en tal situación que se hace correcto, en beneficio de los intereses de la sociedad, que ella informe a terceras personas sobre determinados hechos, y así procede a hacerlo de buena fe. Esta idea general ha sido expresada de otro modo como sigue: Una comunicación hecha de buena fe sobre cualquier asunto en que la persona informante tiene un interés, o con respecto al cual tiene un deber, es privilegiada si se hace a otra persona que tiene un interés o un deber correspondiente, aun cuando contenga materia que, en ausencia de dicho privilegio, constituiría causa de acción, y aun cuando el deber no sea un deber legal y sí sólo un deber moral o social imperfectamente obligatorio. En ausencia de malicia una manifestación puede ser condicionalmente privilegiada, aun cuando no sea cierta, y no obstante el hecho de que contenga la imputación de un delito. Pero un mero pretexto de ocasión legal y de fines justificados no puede librar de responsabilidad a una persona que publica y hace circular materia infamante. Por consiguiente, una publicación pierde su carácter de privilegiada, y puede ser objeto de acción, mediando prueba de verdadera malicia o, por lo menos, de una tal grave falta de consideración a los derechos de la persona perjudicada que equivalga a malicia verdadera. En el caso de una comunicación condicionalmente privilegiada la ocasión en que fué hecha destruye la inferencia que surge *prima facie* de una manifestación perjudicial a la reputación del demandante, e impone a éste la prueba de que hubo malicia verdadera, que el demandado fué movido por razones de despecho o mala voluntad personales, independientes de la ocasión en que se hizo la comunicación.

"Aunque la regla general es que una comunicación hecha de buena fe sobre cualquier asunto respecto del cual la persona que la hace tiene un deber es privilegiada si se hace a una persona que tiene un interés correspondiente, y que este deber no ha de ser necesariamente un deber legal sino que puede ser sencillamente un deber moral o social imperfectamente obligatorio, se ha dicho claramente que no surge privilegio alguno del mero hecho de que un demandado crea que es para él un deber social el hacerse eco de rumores de naturaleza libelosa con el fin de que las gentes eviten el trato con la víctima de esos rumores. La doctrina del privilegio condicional aun no ha llegado a cubrir deberes tan amplios e indefinidos. Una publicación hecha solamente para beneficio de los fines pecuniarios del que la hace no disfruta de privilegio alguno. Por ejemplo, una carta

escrita voluntariamente por uno de dos negociantes rivales, actuando por motivos de lucro personal en perjuicio de su rival, advirtiendo a un embarcador que no debe enviar mercancías a dicho rival, no es una comunicación privilegiada, y el mero hecho de creer en la verdad de las manifestaciones allí contenidas, sin causa justificada para tal creencia, no es una defensa contra una acción por libelo. Además, aunque la doctrina del privilegio condicional según se aplica a ciertas clases de comunicaciones está muy generalmente reconocida, las comunicaciones que contienen manifestaciones infamantes no deben, por regla general, ir más allá de lo que la ocasión requiera, y no existirá protección alguna contra una acción por libelo o calumnia, aunque haya un interés o deber común para las personas entre quienes pasa la comunicación, si las manifestaciones son irrelevantes o van más allá del asunto o propósito de que se trata. Por otro lado, se ha resuelto que el excederse del privilegio de una comunicación acerca de una cuestión en que ambas partes tienen un interés no destruye el privilegio, sino que el exceso en la manifestación sólo afecta a la cuestión de malicia; y asimismo se ha resuelto que tampoco puede la corte quitar al jurado la facultad de considerar el carácter excesivo de una publicación. Parece que el mero hecho de que el lenguaje en un escrito difamatorio hecho en ocasión privilegiada sea algo fuerte o inmoderado no es, en ausencia de prueba de falta de buena fe, evidencia de malicia bastante para demostrar un abuso del privilegio.

"Como no debe excederse el privilegio de una ocasión añadiendo materia extrínseca o irrelevante a una publicación difamatoria, asimismo, como proposición general, la publicación de una manifestación infamante condicionalmente privilegiada no debe ir más lejos de lo que exija el deber moral o social de hacerla, y si una publicación es intencional o innecesaria o negligentemente excesiva, el privilegio queda destruído por esa razón, o cuando menos siempre que un demandado deliberadamente adopta un método de comunicación que da innecesaria publicidad a manifestaciones infamantes para la parte actora, el jurado estará en condiciones de suponer la existencia de malicia. El que hace una comunicación privilegiada debe, por consiguiente, tener cuidado que sus palabras sólo lleguen a aquellas personas a quienes interesa conocerlas, y cuando se hace una amonestación o se dan consejos confidenciales debe hacerse en privado y nunca deben escribirse en tarjetas postales ni publicarse en los periódicos. Se ha resuelto, sin embargo, con respecto a una comunicación que por otros conceptos era privilegiada y que fué en-

viada por tarjeta postal y no por carta cerrada, que si las personas por cuyas manos pasa no pueden comprender que se refiere al demandante entonces no existe prueba de malicia expresa que destruya el privilegio. Con respecto al hecho de que personas extrañas oigan las comunicaciones condicionalmente privilegiadas la regla parece ser que, aunque la mera circunstancia de que ciertas personas que se hallen cerca, no estando legalmente interesadas en la comunicación de que se trata, estén presentes y la oigan, no destruye necesariamente el privilegio, una comunicación injustificada hecha a extraños, ya como resultado de un descuido o de mala conducta intencional, puede ser evidencia de malicia y producir el efecto de que la comunicación sea causa de acción. El privilegio de una comunicación hecha por el tesorero de una corporación al administrador de la misma, instruyéndole para que destituya al capataz y dándole las razones para ello, se ha resuelto que no queda destruído por el hecho de mostrársela al vigilante nocturno, por el fundamento de que éste estaba interesado.'' 17 R. C. L. 341 a 344.

Expuesto lo que antecede, analicemos la prueba. No hay duda alguna que de ella resulta que un rastrillo fué colocado por orden del juez en la puerta del colegio antes de la hora fijada por la ley para cerrarlo y que dicho acto fué interpretado como el cierre del colegio. Es dudoso si con tal motivo dejaron de inscribirse electores republicanos. Es cierto que después de colocado el rastrillo se abrió para dar paso a dos electores unionistas que llevó el Dr. Figueroa, quien reclamó su derecho. Es cierto que allí mismo, frente al propio juez, se alegó por parte de uno de los acusados que el colegio había sido cerrado y que así se había entendido por el pueblo. Es cierto también que no sólo permitió el juez la inscripción de los electores unionistas indicados sí que también la de uno republicano que allí se encontraba.

A nuestro juicio se demostró el cierre imputado, pero no se demostró que el juez rehusara directamente la inscripción de electores republicanos ni por consiguiente la parcialidad manifiesta que también se le imputara. Siendo esto así, es necesario concluir que los acusados no probaron en toda su integridad las imputaciones que hicieran.

Ahora bien, ¿qué circunstancias concurren en este caso? ¿Se trata de una fría y aviesa imputación hecha con el propósito de impugnar la honradez, integridad, virtud o buena fama del Juez Municipal de Bayamón, Presidente de la Junta de Inscripciones de Cataño? ¿Está envuelto el interés público? ¿Qué posición ocupaban los acusados en relación con el presidente de la junta y con la persona a quien dirigieron el telégrama? ¿Actuaron los acusados partiendo de alguna base que puede explicar razonablemente su actitud? ¿Obraron de mala fe? ¿Cuál fué su propósito?

Es evidente que se trataba de una cuestión de interés público. A la comunidad entera interesa que las inscripciones, base en que descansa la formación de las listas de electotores, se conduzca estrictamente de acuerdo con la ley.

Es evidente de igual modo que los acusados tenían intervención, no ya personal sino representativa, en el asunto. Uno era presidente del comité local de un partido político y los otros dos agentes de ese mismo comité, designados para la inspección de las inscripciones. Dichos acusados estaban, pues, relacionados directamente con el presidente de la junta y a él se dirigieron, por lo menos uno, en primer término, y luego lo hicieron a una persona que era el consejero general del partido al cual pertenecían, y no sólo a él sí que también lo hicieron en forma exactamente igual al Superintendente de Elecciones, pidiéndole y obteniendo una investigación que fué practicada y cuyo resultado conocemos, esto es: no se encontró culpable al juez del cargo que se le imputó, pero se recomendó que la práctica de poner el rastrillo fuera prohibida para evitar incidentes iguales al que dió origen a la investigación.

Creemos que nada hay en la conducta del juez, presidente de la junta, que revele la comisión de un acto delictivo. Actuó seguramente de buena fe, pero es lo cierto que su orden para que se cerrara el colegio o para que se realizara

un acto ostensible que indicara el cierre del colegio, fué ilegal y el origen de toda la cuestión.

Los acusados fueron más allá de lo que debieron en sus imputaciones, pero habiéndose basado su actitud en un acto aparentemente ilegal del presidente de la junta, tratándose de una cuestión de interés público, habiendo actuado en una capacidad representativa y dirigídose exclusivamente a una persona que tenía esa misma capacidad en una esfera mayor y al oficial público a quien estaba encomendada la superintendencia de las elecciones en toda la isla, su comunicación debe entenderse en cierto modo privilegiada, y resolverse que no cometieron acto alguno castigable como delito.

Debe revocarse la sentencia y absolverse a los acusados.

> *Revocada la sentencia apelada y absueltos los acusados.*

Jueces concurrentes: Sres. Asociados Aldrey, Hutchison y Franco Soto.

El Juez Asociado Sr. Wolf no intervino en la resolución de este caso.