EL PUEBLO DE PUERTO RICO, demandante y recurrido, *v.* RAFAEL RODRÍGUEZ HERNÁNDEZ, acusado y recurrente.

*Número:* 78    *Resuelto:* 30 de noviembre de 1962

*Jorge Luis Landing* e *Ismael Delgado,* abogados del peticionario; *J. B. Fernández Badillo, Procurador General,* y *Genoveva R. de Carrera, Procurador General Auxiliar,* abogados de El Pueblo.

Sala integrada por el Juez Asociado Señor Belaval como Presidente de Sala y los Jueces Asociados Señores Hernández Matos y Santana Becerra.

EL JUEZ ASOCIADO SEÑOR HERNÁNDEZ MATOS emitió la opinión del Tribunal.

El 26 de enero de 1960 el recurrente Rafael Rodríguez Hernández fue denunciado ante la Sala de Yabucoa del Tribunal de Distrito por el delito de repartir materia libelosa por medio de hojas sueltas, definido y penalizado por los Artículos 243 y 244 de nuestro Código Penal, edición de 1937. [1]

El 9 de mayo siguiente se presentó, con la autorización del tribunal y notificación al denunciado, una denuncia enmendada cuyo texto es el siguiente:

"(Título).—Yo, Ernesto Carrasquillo, res. en Yabucoa, P.R., mayor de edad, formulo denuncia enmendada contra los acusados mencionados por el delito que arriba se consigna, cometido de la manera siguiente:

"El referido acusado Rafael Rodríguez Hernández, por allá por el día 5 de diciembre de 1959 y en la municipalidad de Yabucoa, que forma parte del Tribunal de Distrito de Puerto Rico, Sala de Yabucoa, maliciosamente difamó por medio de

---

[1] Art. 243.—*Líbelo, Definición.*—Constituye líbelo cualquiera maliciosa difamación expresada por medio de escritos, impresos, signos, láminas, dibujos, u otra forma análoga, tendentes a denigrar la memoria de un difunto, o impugnar la honradez, integridad, virtud o buena fama de un vivo, o publicar sus defectos naturales o supuestos, exponiéndole así al odio, desprecio o ridículo público.

"Art. 244.—*Penalidad.*—(Enmendado según la ley de 9 de marzo de 1911, pág. 75.) Toda persona que voluntariamente publicare o hiciere publicar cualquier líbelo, o repartiere, o hiciere repartir cualquiera materia libelosa por medio de hojas sueltas, tarjetas o en cualquier otra forma, impresas o escritas, o fijare o hiciere fijar las mismas en cualquier sitio, incurrirá en pena de multa máxima de cinco mil (5,000) dólares o cárcel por un término máximo de dos (2) años, o en ambas penas, multa y prisión y también las costas de la acción, a discreción de la corte."

hojas sueltas o publicaciones escritas; impresas o preparadas y publicadas en forma análoga y tendentes a impugnar la honradez, honestidad, integridad, virtud, buena fama y buena reputación del denunciante y del ser viviente Ernesto Carrasquillo, exponiéndolo así al odio, desprecio o ridículo público y el referido acusado Rafael Rodríguez Hernández en dicha misma ciudad y día voluntariamente, maliciosamente, publicó, repartió e hizo repartir dicha materia libelosa, injuriosa y falsa por medio de dichas hojas sueltas y fijó los mismos en sitios públicos. El texto de dichas hojas sueltas, copiado íntegramente, dice así:

"Porqué Protestamos y Demandamos una Nueva Dirección en Nuestra Unión.—Compañeros y trabajadores de la Industria Azucarera de Yabucoa: Hoy nace para ustedes un nuevo día repleto de hermosas esperanzas. Vuestra fe unida al esfuerzo mutuo, les abrirá el sendero que conduce a la cumbre del progreso y de la felicidad.

"Nuestro movimiento emancipador continúa con todo vigor. De ustedes mismos depende que en un futuro cercano podamos gozar la satisfacción de haber salvado nuestra Unión, lanzando fuera a los líderes de estómago, que sólo quieren perpetuarse en la Directiva para disponer de los fondos de nuestra Unión y burlarse de los principios de responsabilidad.

"Ganar una presidencia con votos es una honra, pero incautarse de ella mediante la traición, es vender la dignidad y la vergüenza. Así actuó Carrasquillo. Llegó a la presidencia recurriendo al engaño, la farsa y el cuento. Hizo lo mismo que Judas cuando vendió a Cristo.

"¿Cómo puedes tú, Carrasquillo, hablar de principios si tú toda tu vida te la has pasado viviendo de nosotros, los obreros?

"Carrasquillo, nunca has conocido lo que es respeto, dignidad ni compañerismo. Todavía está en el recuerdo de los trabajadores aquel trágico día cuando diste la puñalada trapera para agarrar la presidencia.

"El lidercito Carrasquillo no estaba interesado en defender los derechos de ustedes. No. Él solamente quería adueñarse de la Unión, de los fondos para disponer de vuestros dineros. Durante muchos años el lidercito Carrasquillo se ha estado burlando de ustedes. Día tras día, minuto tras minuto, continúa violando los derechos de ustedes. Él dice que no cederá la presidencia porque es el ñame más fácil que ha tenido en su vida.

Claro que sí, porque puede disponer de los fondos sin que nadie pueda censurar sus actuaciones.

"De ustedes mismos depende lanzar fuera a Carrasquillo, un monigote del movimiento obrero. En vuestras manos tenéis ustedes la espada para combatir los abusos de poder del cacique Carrasquillo, que nunca ha sabido honrar la confianza que en él pusimos los trabajadores.

"La hora de la redención ha llegado. La luz del sol de la esperanza brilla en el sendero que conduce a la cumbre de las justas y nobles demandas. Carrasquillo tiene tiempo para reparar su infamia. Nunca es tarde para responder a la culpa.

"Carrasquillo, hoy te concedemos la oportunidad de que hagas tu confesión ante los propios trabajadores que son los mismos a quienes traicionaste hace algunos años cuando nos entregaste al patrono. No olvides que los trabajadores ya han despertado del letargo y que comienzan a ver la luz del nuevo día, el resplandor que les guía por el camino de nuevas conquistas, de verdaderos laureles.

"Ha llegado la hora de limpiar la casa. Ustedes queridos compañeros, deben comenzar por el cuentista del siglo, el actor Carrasquillo, para que éste no prosiga la fiesta. Demuéstrenle a este traidor que ya ustedes conocen su negra historia, llena de infamias, farsas, calumnias y traiciones. A LA LUCHA Y A LA VICTORIA. POR EL COMITÉ DE RENOVACIÓN DE NUESTRA UNIÓN—Fraternalmente (fdo.) Pedro Cruz Tirado, Ángel Rodríguez Rodríguez, Ramón Muñoz Alberio, Francisco Rodríguez Cabrera, Rafael Vergara Dones, Pablo Sénquis, José Manuel Vega, Andrés Vega Rivera, Ignacio Medina Millán, Eleno Álvarez Andino, Juan Medina Ortiz, Juan Fonseca de Jesús, Julián Álvarez Millán, Antonio Muñoz, Valentín Fonseca de Jesús, Venancio Arroyo Martínez, Carmelo Rodríguez Rivera, Isidoro Andújar Ortiz, Juan Cruz Andino, Juan Tirado Álvarez, Francisco Rodríguez Cruz, Zoilo Colón Vázquez, Leoncio Medina de Jesús, Ángel Rivera Pagán, Antonio Laboy Burgos, Hermógenes Sánchez Vargas, Rufino Morales, Ignacio Robles García, Carmelo Ramos.—

"Esta comunicación y todas las demás que publicaremos están respaldadas y autorizadas por más de mil trabajadores de Yabucoa. En nuestras próximas comunicaciones haremos la historia de cómo Carrasquillo ha abusado de nosotros.'—E. Carrasquillo, denunciante."

El juicio fué celebrado el 26 de ese mes de mayo. El tribunal de origen lo declaró culpable y le impuso una pena de noventa días de cárcel. Apeló para la Sala de Humacao del Tribunal Superior y ésta confirmó la sentencia el 16 de marzo de 1961.

A solicitud del denunciado libramos el 16 de junio de 1961 un auto para revisar los procedimientos y acordar lo que fuera arreglado a derecho. En su alegato señala y discute la comisión de seis errores, a saber: (1) La hoja suelta no es libelosa; (2) la misma constituye una comunicación privilegiada; (3) no se probó que él la conociera; (4) la convicción es contraria al principio constitucional de libre expresión del pensamiento; (5) la convicción es contraria al derecho constitucional de los trabajadores a organizarse, y (6) al denunciado se le despojó de su derecho a un juicio por jurado.

Antes de proceder al estudio de esos puntos de apelación, expondremos las circunstancias de hecho reveladas por los autos. La Unión de Trabajadores de Yabucoa es una organización obrera con sede en la población de Yabucoa. Su matrícula está compuesta principalmente por obreros de la industria azucarera. Para el mes de diciembre de 1959 existía una contienda obrera entre sus agremiados. Un sector de la misma, denominado "Comité de Renovación", había presentado una petición ante la Junta Insular de Relaciones del Trabajo para que se celebraran elecciones a los fines de elegir una nueva directiva. Interesaba la deposición de su presidente Ernesto Carrasquillo. Se habían celebrado sesiones borrascosas, llegándose al extremo de las agresiones personales entre los miembros rivales. Los grupos en contienda recíprocamente se imputaban actuaciones reñidas con el bienestar y la mejor defensa de los intereses de los obreros unionados. El medio de difusión de argumentos preferido parece que era el de la preparación y distribución de hojas sueltas. Ernesto Carrasquillo era la persona que "preparaba casi to-

das esas hojas sueltas" que salían del grupo que defendía a los directores de la unión, según el testimonio en juicio de su secretario Jesús Santiago Rivera.— R.C. pág. 12.

El 5 de diciembre de 1959 se distribuyó la titulada "POR-QUÉ PROTESTAMOS Y DEMANDAMOS UNA NUEVA DIREC-CIÓN", del "Comité de Renovación" que se transcribe en la denuncia. El 15 de ese mes aparece una de los directores titulada "VERDADES CONTRA MENTIRAS" — Exhibit 1, defensa— que dice así:

"Siguiendo su campaña de difamación y asquerosidades contra la Unión de Trabajadores de Yabucoa y su presidente, Hon. Ernesto Carrasquillo, los líderes Republicanos vuelven a la carga con otra hoja suelta anónima que han titulado 'El Pulpo y su Historia'. Como en uno de sus párrafos estos campeones de la infamia y de la grosería nos mencionan en forma tal que no podemos dar paso a tanta mentira sin que aclaremos la verdad, creemos nuestra obligación contestar la parte que nos corresponde para que aquellos trabajadores que la desconocen puedan señalar con mirada de desprecio a los que por todos los medios están tratando de que los trabajadores vuelvan a la esclavitud. Por tanto, compañeros, la verdad es como sigue:

"Allá para el año 1951 un grupo de obreros agremiados de la Unión que preside el Sr. Ernesto Carrasquillo, creímos que debíamos afiliarnos a la ILA para acogernos al plan de beneficencia que esta organización anunciaba poner en funciones. La otra parte de nuestra Unión respaldaba al Presidente quien era de opinión que la Unión de Trabajadores de Yabucoa podía establecer su propio plan de beneficencia sin necesidad de afiliarse a otra organización a la cual teníamos que pagar cuotas de per cápita, lo que significaba menos ingresos para nuestra Unión. No hubo acuerdo entre los grupos y los que abogábamos por la afiliación con la ILA nos separamos formando la Unión Amalgamada de la Factoría. Creyéndonos fuertes y poderosos solicitamos de la Junta Nacional de Relaciones del Trabajo la celebración de elecciones obreras, y como resultado fuimos derrotados por una mayoría abrumadora de trabajadores.

"Reconociendo que el triunfo de la Unión que preside el señor Carrasquillo era absolutamente legal, y conscientes de

que en las elecciones celebradas no hubo irregularidades, es decir no hubo trampas como dicen en su hoja los Republicanos, volvimos a las filas de la Unión de Trabajadores de Yabucoa, quedándose afuera dos o tres personas, quienes cediendo a cuestiones políticas y de enemistad, se quedaron con el encono tratando de hacer el mayor daño posible a la Unión y su presidente. Volvimos a esta Unión y aquí estamos dispuestos a defenderla con alma, vida y corazón contra todas las artimañas de los malhechores que quieran destruirla o traten de entregarla a los patronos con organizaciones de capataces.

"¿Quién destruyó la Unión Amalgamada de Factoría? ¿Lo sabe ese historiador mal informado que ni siquiera conoce la historia de su nacimiento? La Unión de referencia nadie la destruyó. Se fue en la misma forma que había venido. Murió al nacer por la fuerza arrolladora de la otra parte que nos conquistó con su gran triunfo, llamándonos a trabajar todos unidos y en la mejor armonía para bien de todos los trabajadores de la Industria Azucarera de Yabucoa.

"En Yabucoa, a 15 de diciembre de 1959. Joaquín Cintrón. —Gilberto Cintrón García.—Ambrosio Velázquez."

El 26 de enero de 1960, Ernesto Carrasquillo formuló ante la Sala de Yabucoa del Tribunal de Distrito, nueve denuncias, la Núm. 60–125, contra Rafael Rodríguez Hernández, por repartir una hoja suelta; las numeradas 60–126 a 60–133, contra Francisco Rodríguez Cabrera, Angel Rivera Pagán, Valentín Fonseca de Jesús, Hermógenes Sánchez Vargas, Carmelo Ramos Figueroa, Rafael Vergara Dones, Juan Tirado Alvarez e Ignacio Robles García, respectivamente, como personas firmantes de y que hicieron publicar la hoja suelta repartida el 5 de diciembre. Las nueve denuncias fueron juramentadas ante el secretario Juan León Carrasquillo.

El 2 de mayo de 1960, a petición del denunciante Ernesto Carrasquillo, el Secretario de Justicia designó al Lic. Víctor Gutiérrez Franqui para que actuara de fiscal especial en esos nueve casos.

Como antes expusimos, el juicio fué celebrado el 26 de mayo de 1960. Para el mismo, como testigo de cargo, fué

también citado y compareció, el entonces Fiscal del Tribunal Superior, Sala de Humacao, Hon. Modesto Velázquez Flores. El denunciante Carrasquillo no prestó testimonio, pero a pesar de la oposición de los denunciados, estuvo presente en corte durante la celebración del juicio.

La prueba ofrecida por el fiscal especial consistió del testimonio oral de Jesús Santiago Rivera, secretario de la unión, y de un ejemplar de la hoja suelta del Comité de Renovación insertada en las denuncias enmendadas. Respecto al aquí peticionario, ese único testigo de cargo se limitó a declarar que en el día 5 de diciembre de 1959, Rafael Rodríguez Hernández le había entregado una hoja suelta, igual a la admitida en evidencia, estando el testigo en la Calle Cristóbal Colón de Yabucoa y cerca de la Plaza de Recreo de ese pueblo, y que lo vió repartirla allí "a muchísimas personas". —Relación del Caso, pág. 8.

No obstante haber jurado Ernesto Carrasquillo ante el Secretario Juan León Carrasquillo las otras denuncias presentadas contra solamente ocho de las veintinueve personas que supuestamente firmaron la hoja suelta titulada "POR QUE PROTESTAMOS Y DEMANDAMOS UNA NUEVA DIRECCION EN NUESTRA UNION", y de figurar en esas denuncias como testigos "Jesús Santiago Rivera, Dionisio Ayala Fernández, Joaquín Cintrón Lebrón, residentes del Caserío Dr. Berríos, de Yabucoa, y M. Velázquez Flores (fiscal), Humacao, P. R.", el fiscal especial Gutiérrez Franqui no ofreció prueba alguna contra esas ocho personas, quienes, según el denunciante Carrasquillo expuso bajo juramento en las denuncias Núms. 60–126 a 60–133, hicieron publicar el 5 de diciembre de 1959, con el propósito de difamarlo y de impugnar su "honradez, honestidad, integridad, virtud, buena fama y buena reputación" la hoja suelta del Comité de Renovación.

Al solicitar el abogado defensor la absolución perentoria de todos los nueve denunciados, el fiscal especial Gutiérrez Franqui manifestó: "Sr. Juez, nosotros nos allanamos me-

nos al repartidor de la prensa . . . no tenemos prueba de que ellos firmaron esa hoja." R.C., p. 29. Acto seguido el juez absolvió a los ocho denunciados como firmantes y continuó el caso contra "el repartidor".

La prueba de defensa consistió en un ejemplar de la hoja suelta "VERDADES CONTRA MENTIRA", preparada por la directiva de la Unión y la declaración de Carmelo Ramos, uno de ocho denunciados absueltos y "Vice-Presidente del Comité de Renovación". Este testigo "de defensa" declaró que el denunciado era un "organizador en el Comité de Renovación; (²) que las hojas sueltas tenían que ver con la labor de repartición del comité; que como organizador el denunciado "tenía el deber de distribuir hojas sueltas" a los compañeros de trabajo; que el denunciado no era miembro de la Unión de Trabajadores de Yabucoa, ni trabajador.

La última expresión del abogado defensor fué:

"Sr. Juez, la parte preparatoria de la organización de la asamblea que se efectuó fue las hojas sueltas que él distribuyó. Sometido."—R.C., pág. 45.

Hemos estudiado detenidamente los señalamientos de errores y a nuestro juicio ninguno de los apuntados y discutidos se ha cometido.

## I

Para sostener que la hoja suelta repartida por el peticionario no es libelosa, éste expone que la misma es del tipo corriente que "se utiliza en las contiendas sindicales y en las luchas políticas"; que es un llamado a los trabajadores para unir sus esfuerzos, que su título indica las razones por las cuales fué redactada y el propósito de enumerar los motivos

---

(²) Al preguntársele desde cuándo era organizador, contestó "Desde esa fecha". Esta frase, según la parte de su testimonio que la precede, parece referirse al día en que ese comité se fundó, que parece ser el 20 de diciembre de 1959, o a alguna otra fecha dentro "del diez o el doce" de ese mes. De todos modos su carácter de "organizador" aparece que lo asumió después de la repartición de la hoja suelta del 5 de ese mes.

por los cuales desean los trabajadores que se suplante la actual dirección de la Unión; que tiene una "técnica espiritualista"; que no se trata de imputaciones de delito público, sino de "afirmaciones generales y que cuando los hombres entran en el campo de la política o de las luchas sindicales pierden parte de su privacidad y sus actuaciones están sujetas a ser criticadas y analizadas por sus opositores."

Una simple lectura de la hoja suelta titulada "POR QUE PROTESTAMOS Y DEMANDAMOS UNA NUEVA DIRECTIVA EN NUESTRA UNION", es suficiente para concluir que la misma no es una de tipo común, ni tiene alguna "técnica espiritualista", ni contiene solamente afirmaciones generales, inocentes e ingenuas. En realidad es un escrito o impreso malicioso y difamatorio, cuyo fin y propósito, a pesar de los matices demagógicos y estilo inflamatorio de su lenguaje no es otro que el de desacreditar públicamente al denunciante y presentarlo ante el público y la matrícula de la Unión como candidato degenerado, depravado e incapaz para el fiel desempeño de su presidencia.

La hoja suelta identifica claramente al denunciante como la persona a la cual se dirige. Sobre este extremo no hubo contienda. Entre los términos y frases que la misma emplea, se encuentran los siguientes:

1. " . . . lanzando fuera a los *líderes de estómago*, que sólo quieren perpetuarse en la Directiva para *disponer de los fondos de nuestra Unión y burlarse de los principios de responsabilidad.*

2. "Ganar una presidencia con votos es una honra, pero incautarse de ella mediante la traición, es *vender la dignidad y la vergüenza.* Así actuó Carrasquillo. Llegó a la Presidencia *recurriendo al engaño, la farsa* y el cuento. Hizo lo mismo que Judas cuando *vendió a Cristo.*

3. "¿Cómo puedes tú, Carrasquillo, hablar de principios si tú *toda tu vida te la has pasado viviendo de nosotros, los obreros?*

4. *"Carrasquillo, nunca has conocido lo que es respeto, dignidad ni compañerismo.* Todavía está en el recuerdo de los trabajadores aquel trágico día cuando *diste la puñalada trapera* para agarrar la Presidencia.

5. "El lidercito Carrasquillo no estaba interesado en defender los derechos de ustedes. No. *El solamente quería adueñarse de la Unión, de los fondos para disponer de vuestros dineros.* Durante muchos años el lidercito Carrasquillo se ha estado burlando de ustedes. Día tras día, minuto tras minuto, continúa violando los derechos de ustedes. El dice que *no cederá la Presidencia porque es el ñame más fácil que ha tenido en su vida.* Claro que sí, porque *puede disponer de los fondos sin que nadie pueda censurar sus actuaciones.*

6. "De ustedes mismos depende lanzar fuera a *Carrasquillo, un monigote del movimiento obrero.* En vuestras manos tenéis ustedes la espada para cobatir los *abusos de poder del cacique Carrasquillo, que nunca ha sabido honrar la confianza* que en él pusimos los trabajadores. La hora de la redención ha llegado. La luz del sol de la esperanza brilla en el sendero que conduce a la cumbre de las justas y nobles demandas. *Carrasquillo* tiene tiempo para reparar *su infamia.* Nunca es tarde para responder a la culpa.

7. "Carrasquillo, hoy te concedemos la oportunidad de que hagas tu confesión ante *los propios trabajadores que son los mismos a quienes traicionaste hace algunos años cuando nos entregaste al patrono.* No olvides que los trabajadores ya han despertado del letargo y que comienzan a ver la luz del nuevo día, el resplandor que les guía por el camino de nuevas conquistas, de verdaderos laureles. Ha llegado la hora de limpiar la casa. Ustedes, queridos compañeros, deben comenzar por *el cuentista del siglo, el actor Carrasquillo,* para que éste no prosiga la fiesta. Demuéstrenle a este *traidor que ya ustedes conocen su negra historia, llena de infamias, farsas, calumnias y traiciones."* (Subrayado nuestro.) ■

Es cierto que esas frases no imputan técnicamente la comisión o intención de cometer algún delito público específico. Pero consideradas en conjunto y en el significado o concepto general y corriente en que aquí se entienden, constituyen una serie de imputaciones graves e infamantes que tienden directamente a impugnar la honradez, integridad, virtud o buena fama de que goce la persona a quien se dirigen, y a exponerla, sin duda alguna, al odio, desprecio o ridículo público. ■

El Art. 246 del Código Penal permite en estos casos como defensa que se pruebe como ciertas esas imputaciones y que se publicaron con sana intención y para fines justificables. El denunciado ni probó, ni tan siquiera intentó probar, que fueran ciertas. En estas circunstancias la publicación de las misma se presume maliciosa. (³) ■

En distintas ocasiones nos hemos encontrado con publicaciones semejantes. (⁴) Siempre hemos considerado el significado que en el lenguaje vulgar en Puerto Rico tienen las frases o palabras señaladas como materia libelosa. En el citado caso de *Pargas*, consideramos que si bien las palabras en cuestión no constituían un delito público respecto a uno de los casos resueltos por la opinión, sin embargo, al decir el denunciado que cierta persona traicionó a su partido "por el estómago", significaba que había cambiado sus ideales por

(³) El Artículo 245 del Código Penal dispone:

"Se presumirá maliciosa toda publicación injuriosa, si no se probare que hubo motivo justificable para hacerla."

(⁴) Cfr. *Pueblo v. Prensa Insular*, 69 D.P.R. 683 (1949); *Pueblo v. Pargas*, 67 D.P.R. 818 (1947); *Pueblo v. Antonmarchi*, 64 D.P.R. 358 (1945); *Pueblo v. Girona*, 59 D.P.R. 296 (1941); *Pueblo v. Pacheco Padró*, 58 D.P.R. 737 (1941); *Pueblo v. Cupril*, 57 D.P.R. 117 (1940); *Pueblo v. Rodríguez*, 55 D.P.R. 864 (1940); *Pueblo v. Mirayes*, 52 D.P.R. 319 (1937); *Pueblo v. Sierra*, 48 D.P.R. 261 (1935); *Pueblo v. Cardona*, 43 D.P.R. 318 (1932); *Pueblo v. Gotay*, 43 D.P.R. 461 (1932); *Pueblo v. Quintana*, 39 D.P.R. 197 (1929); *Pueblo v. Alamo*, 38 D.P.R. 112 (1928); *Pueblo v. Forestier*, 36 D.P.R. 877 (1927); *Pueblo v. Bernard*, 32 D.P.R. 857 (1924); *Pueblo v. Brau*, 27 D.P.R. 779 (1919); *Pueblo v. Colberg*, 24 D.P.R. 673 (1916); *Pueblo v. Villaveitía*, 24 D.P.R. 264 (1916).

haber recibido una dádiva, lo cual "sin duda lo expone al menosprecio público." ■

Es verdad que hemos resuelto que en estos casos las frases calumniosas o libelosas deben interpretarse en sentido liberal, teniendo en cuenta el interés público y a favor de la libertad de la palabra y del derecho que tiene todo ciudadano a discutir acerca de los funcionarios públicos y cuestiones en general y que es una de las infelicidades de la vida pública que un funcionario público tenga por tal motivo que estar sujeto a la crítica y a menudo a injustos comentarios; y que a menos que éstos se excedan de los límites fijados por la ley deberán ser tolerados en defensa del mantenimiento de la libertad de palabra. —Véase el también citado caso de *El Pueblo* v. *García*.[5] Pero sin vacilación alguna ahora decimos que la publicación de la hoja suelta repartida por el peticionario se excedió de los límites fijados por la ley y penetró en la zona prohibida por nuestro Código Penal. ■

## II

A la luz de las circunstancias concurrentes, la hoja suelta, aun cuando fuera repartida o "publicada en el curso de una contienda sindical", no constituía una comunicación privilegiada. ■

El Artículo 251 del Código Penal dispone que se tendrá por privilegiada una comunicación cuando la misma se dirige

---

[5] En ese caso se imputó al apelante un delito de injurias y calumnias (no de libelo como en el presente), consistente en que públicamente había dicho en la Plaza del Mercado de Vieques: "El Alcalde de este pueblo de Vieques es un vago, es un vagabundo, debiera ocuparse de trabajar y de las necesidades de los pobres." Resolvimos que esas palabras no eran calumniosas con arreglo a la ley aplicable al caso.

La sección 3 de la Ley definiendo Derechos del Pueblo, aprobada en 27 de febrero de 1902—1 L.P.R.A. sec. 11—dispone:

"No se coartará a nadie la libertad de la palabra, y toda persona tendrá entera libertad para hablar, escribir o publicar lo que le plazca sobre cualquier asunto, *siendo responsable, sin embargo, de todo abuso en que incurra de esa libertad.*" [—Énfasis suplido.]

a persona interesada en tal comunicación, por otra que también lo estuviere, o cuyas relaciones con aquélla justificare la suposición de haber obrado sin malicia. ■

En los casos de libelo en que se trata de una comunicación privilegiada, la obligación de probar cambia, y en vez de presumirse malicia contra el denunciado con motivo del uso de las palabras difamatorias, debe El Pueblo demostrar la existencia de malicia por medio de otra prueba que no consista en el mismo documento infamatorio. *Pueblo* v. *Polo*, 14 D.P.R. 786, 791 (1908).

La prueba de la defensa en este caso demostró que el denunciado, a la fecha en que repartió la hoja suelta por las calles de Yabucoa, no era miembro de la Unión de Trabajadores de Yabucoa, ni del Comité de Renovación, ni aun era un trabajador. Es cierto y así lo demostró la prueba, que por lo menos parte de los que figuraban como firmantes o autores de la hoja suelta, eran miembros de esa Unión, aunque deseaban un cambio de sus directores. Pero esa hoja suelta con ese contenido libeloso se distribuyó o repartió públicamente en las calles de Yabucoa sin que el denunciado probase que las personas a quienes repartió fuesen miembros de la Unión o no eran extrañas a los intereses de la misma. Es cierto que está dirigida a los "Compañeros trabajadores de la Industria Azucarera de Yabucoa", pero esta mera circunstancia y la existencia de una contienda sindical no justificaban que se utilizara para denigrar, desacreditar y vilipendiar públicamente a persona alguna y para exponerla al odio, ridículo o desprecio público. Contra esto dice nuestra Constitución, en la sección 8 de su Artículo II:

"Toda persona tiene derecho a protección de ley contra ataques abusivos a su honra, a su reputación y a su vida privada o familiar." ■

El derecho a la libre expresión o comunicación para promover de buena fe los intereses legítimos en estas contiendas

obreras conlleva la obligación de abstenerse de publicar o comunicar falsedades, mentiras y calumnias. Es claro que tales disputas, como se dijo en *Emde* v. *San Joaquín County Central Labor Council*, 23 Cal.2d 146 (1943), consideradas desde un punto de vista realístico, normalmente envuelven considerables diferencias de opinión y la vehemente adhesión a un lado o a otro y que debe reconocerse un área extensa para que se desarrollen sin responsabilidad como concomitante con esas controversias obreras. —Véase *"Libel Actions Arising From Labor Disputes"*, *Wis. L. Rev.*, Vol. 1953, págs. 536–550; Anotaciones en 150 A.L.R. 932 y 19 A.L.R.2d 694.

Es cierto que el público tiene o debe tener interés en toda contienda obrera que en alguna forma pueda afectar su bienestar, y que debe estar informado del curso y resultado de aquellas luchas sindicales cuyos efectos, buenos o malos, puedan reflejarse sobre él. Pero la existencia natural y ordinaria de ese interés de parte de la comunidad no la constituye, a los fines del Art. 251 del Código Penal en la "persona interesada en tal comunicación", y a quien se dirige y quien recibe la comunicación privilegiada. Los que tenían un interés común en la materia de la hoja suelta eran los miembros de la Unión llamados a votar en las elecciones obreras solicitadas.([6]) Al repartirse públicamente esa hoja suelta entre la ciudadanía de Yabucoa, perdió su condición de comunicación privilegiada, asumiendo, desde luego, que la hubiera tenido.

A virtud de esa publicación la comunicación que literalmente se dirigió a los "Compañeros trabajadores de la In-

---

([6]) Cfr. Corpus Juris Secundum, T. 53 *Libel—Sects.* 87 B y C, 91, 92 y 96. *Simon* v. *Robinson*, 154 A.2d 911; *Della Posta* v. *Rand Express Freight Lines*, 133 A.2d 775; *Smith* v. *Surtees*, 143 S.W.2d 90; *Aetna Life Ins. Co.* v. *Mutual Benefit Health & Acc. Assn.*, 82 F.2d 115; *Fisher* v. *Myers*, 100 S.W.2d 551; *Draper* v. *Hellman Commercial Trust & Savings Bank*, 263 P. 240; 33 Am. Jur. *Libel—Sects.* 126, 127, 132; *Newell-Slander & Libel*, Sect. 563, pp. 575, 623, 629.

dustria Azucarera de Yabucoa", salió de la esfera interna de la Unión, dándose al público como algo definitivo y cierto. —Véase *Pueblo v. Lastra Charriez*, 50 D.P.R. 118 (1936); *Pueblo v. Mirayes*, supra; *Pueblo v. Rodríguez*, supra. ■

## III

La prueba de la defensa no demostró que el denunciado desconociera el contenido de la hoja suelta. El Artículo 244 castiga, entre otros, al que voluntariamente "repartiere o hiciere repartir cualquiera materia libelosa por medio de hojas sueltas." No exige al repartidor conocimiento del contenido de la hoja suelta.

En *Pueblo v. Rodríguez*, 38 D.P.R. 665 (1928), confirmamos la sentencia que condenó a un repartidor de una hoja suelta libelosa que no sabía leer ni escribir y quien, además, al descubrir la naturaleza de la publicación, destruyó las copias que le quedaban.(7) ■

---

(7) Dijimos en ese caso:

"Cualquier comunicación de un libelo a otra persona es una publicación del mismo. 36 C.J. 1223; 37 C.J. 141.

"Una persona que distribuye hojas sueltas conteniendo materia libelosa, presuntivamente comunica su contenido a otras personas, y es culpable de publicar un libelo.

"El apelante sostiene que no pudo haber malicia en este caso, toda vez que él no sabía leer ni escribir. En verdad, hubo prueba tendente a demostrar que tan pronto como el apelante descubrió la naturaleza de la publicación, destruyó las copias que le quedaban.

"La malicia debe presumirse de la publicación misma. De lo contrario, los editores, los publicistas y otras personas más podrían eludir responsabilidades. 16 Cal. Jur. 166; *In re Kowalsky*, 73 Cal. 120; *Commonwealth v. Snelling*, 15 Mass. (Pick.) 337. Aquel que no conozca el contenido de una hoja suelta debe cerciorarse de ello antes de distribuirla. Si la distribuye, aunque lo haga por ignorancia, comete un acto ilegal intencionalmente.

"De acuerdo con el artículo 245 del Código Penal, se presumirá maliciosa toda publicación injuriosa si no se probare que hubo motivo justificable para hacerla."

El Tribunal Superior, Sala de Humacao, al confirmar la sentencia del Tribunal de Distrito respecto a este punto, dijo:

"El Tribunal entiende que el acusado, cuando repartía la hoja suelta en cuestión, tenía conocimiento de lo que estaba haciendo. La prueba tiende a probar que el acusado, con conocimiento de ello, repartía y hacía circular dicha hoja suelta en el pueblo de Yabucoa." (Sentencia, pág. 5.)

## IV y V

La convicción del denunciado no fué contraria al principio constitucional de libre expresión ni al derecho constitucional de los trabajadores a organizarse.

Como expresamos en *Pueblo* v. *Lastra*, a la página 129, supra, "el derecho a la crítica fuerte, alerta, severa, apasionada aún, no puede ser restringido. Corresponde a los ciudadanos de un pueblo libre. Es suyo y nadie puede arrebatárselo. Sobre eso no hay duda alguna."

En *Pueblo* v. *Pacheco Padró*, 58 D.P.R. 737 (1941), en que se le imputó a un periodista la comisión de un delito de libelo, dijimos lo siguiente:

"No está envuelta en estos casos, según insisten los apelantes, limitación alguna al derecho constitucional de libertad de la prensa. La campaña que la revista *Florete* llevó a cabo durante varios meses demuestra que mientras hizo buen uso de ese derecho nadie fué denunciado. Lo que garantiza la Constitución de los Estados Unidos y la Carta Orgánica de Puerto Rico es el buen uso pero no el abuso de ese derecho. Los derechos constitucionales de los individuos particulares son tan sagrados como la libertad de la prensa y el hecho de que el denunciante en este caso fuera un legislador no le privaba de su derecho a no ser difamado maliciosamente. Los periodistas gozan de un privilegio que les reconoce nuestro Código Penal en su artículo 249, pero si lo violan no pueden ir más allá y tratar de ampararse bajo el privilegio más amplio y protector de la libertad de la prensa. Ésta puede y debe ser libre sin necesidad de caer en la malicia, el escándalo o la difamación, y la garantía constitucional antes mencionada no constituye defensa alguna cuando se comete el delito de libelo.

"Desde el año 1904 este tribunal, en el caso de *Ex parte Bird*, 5 D.P.R. 247 (2da. ed.), al referirse a la libertad de

la palabra y de la prensa garantizada por la primera enmienda a la Constitución de los Estados Unidos, se expresó, por medio del Juez Asociado Sr. MacLeary, en esta forma:

" 'Nosotros creemos, sin duda alguna, que nadie, bajo estas disposiciones de la Constitución, aun si se sostuviera que está vigente en esta Isla, podría reclamar que por las mismas tendría derecho de publicar, a su capricho, cuanto le plugiera en cuanto a personas o funcionarios, o jueces de los tribunales, en sus relaciones públicas o particulares. En otras palabras, es la libertad de la prensa y no la licencia desenfrenada lo que se intenta proteger por esta disposición de la Constitución.' " █

El derecho a organizarse de los trabajadores garantizado por las Secciones 17 y 18 del Artículo II de nuestra Constitución tampoco puede constituir defensa alguna cuando se comete el delito de libelo. La propia Constitución nuestra, es la que, como antes dijimos, también dispone, en la sección 8 de ese Artículo II, que "toda persona tiene derecho a protección de ley contra ataques abusivos a su honra, a su reputación y a su vida privada o familiar." █

## VI

En su sexto señalamiento sostiene el peticionario que en los procesos por libelo el denunciado tiene derecho a juicio por jurado y que del mismo fué despojado. Apoya su tesis en el Artículo 246 de nuestro Código Penal que dispone:

"En todos [los] procesos promovidos por libelo, se podrá testificar la verdad ante el tribunal o *jurado*, y si éste estimare ser cierto lo denunciado como infamatorio, y haberse publicado con sana intención y para fines justificables, deberá absolverse libremente al acusado; *incumbiendo al jurado determinar las cuestiones de hecho y de derecho*." (Itálicas nuestras.)

Concordando con la última parte de ese artículo, nuestro Código de Enjuiciamiento Criminal, en su Artículo 264 lee así:

"En los juicios por líbelo (injuria y calumnia con publicidad) *incumbe al jurado* determinar los puntos de hecho y de derecho." (Itálicas nuestras.)

Como se verá, ninguno de esos artículos tiene el propósito específico de conceder el derecho a un juicio por jurado en los procesos criminales por líbelo. Solamente contienen disposiciones respecto a lo que debe hacer el jurado en cierto caso y a quién corresponde determinar las cuestiones de hecho y de derecho, cuando el juicio por líbelo se ventila ante un jurado, como ocurría, y sigue ocurriendo, en el Estado de California, de donde proceden los citados artículos 246 y 264. En ese Estado, la Constitución de 1879 garantiza, en general, el derecho a juicio por jurado en todos los casos criminales y establece su inviolabilidad, en su Artículo 1, sección 6. En la sección 9 del mismo artículo, se garantiza la libertad de palabra (en la forma en que lo hace la sección 3 de la Ley nuestra de 27 de febrero de 1902, que insertamos en el escolio 7) y, especialmente se hacen, respecto a los juicios por líbelo, las mismas disposiciones contenidas en los transcritos artículos 246 y 264.

Al establecerse el jurado en Puerto Rico por la ley del 12 de enero de 1901, únicamente se le concedió facultad a los "tribunales de distrito" para otorgar el "juicio por jurados."

Al empezar a regir en 1 de julio de 1902 los actuales Código Penal y Código de Enjuiciamiento Criminal se concedió también el juicio por jurado, pero para su celebración exclusiva ante los tribunales de distrito hoy Tribunal Superior. Como la jurisdicción para entender en juicios por líbelo residía en los tribunales municipales, carecían aquí de aplicación, —mientras ésa fuera la situación— los artículos 246 del Código Penal y 264 de Enjuiciamiento Criminal adoptados de California.

Por esa razón, creemos, se aprobó el 10 de marzo de 1904, una ley derogando por su sección primera, la mencionada

"Ley sobre Procedimientos en los Juicios por Jurado" de 1901, y disponiendo en su sección 2 lo siguiente:

"Sección 2.—El propósito de esta Ley es dejar en toda su fuerza y vigor la Ley de Jurados comprendida en el Código de Enjuiciamiento Criminal de Puerto Rico, *excepto en cuanto la misma se refiere al juicio de presos por libelo.*" (Itálicas nuestras.)

Así se eliminó la incongruencia de conceder ciertas facultades al jurado en juicios ante las cortes municipales donde ningún jurado actuaba.

Sin embargo, en las sucesivas ediciones del Código Penal y del Código de Enjuiciamiento Criminal hasta el presente, aparecen como vigentes esos artículos 246 y 264. Quizá, si alguna vez se concede el derecho a juicio por jurado ante el actual Tribunal de Distrito, ellos puedan tener, por primera vez, aplicación a los juicios por libelo. Pero ya esto sería una cuestión legislativa, no judicial.

Nuestra Constitución, en su Artículo II, sección 11, solamente garantiza el juicio por jurado "en los procesos por delitos graves." La Ley de la Judicatura de 1952 le concedió facultad exclusiva al Tribunal de Distrito (antes Corte Municipal) para entender solamente en casos de delitos menos graves.

La cuestión no fué suscitada ante el Tribunal de Distrito ni ante el Superior. Se plantea ante nos por primera vez y así lo hace constar el peticionario.

En sentido adverso a éste resolvimos su planteamiento en *Pueblo* v. *Bird,* 5 D.P.R. 189, 197 (1904), segunda edición, *Ex Parte Bird,* 5 D.P.R. 247, 267 (1904), segunda edición, y *Pueblo* v. *Rodríguez,* 31 D.P.R. 699, 700 (1923).

En la segunda de esas decisiones, *Ex Parte Bird,* luego de copiar el texto del artículo 246 del Código Penal, resolvimos:

"Por cuanto la ley del jurado que ha sido incorporada en el Código de Enjuiciamiento Criminal, dispone que ninguna

persona tiene derecho a un juicio por jurado cuando esté acusada solamente de *misdemeanor* [y libelo es solamente un *misdemeanor* con arreglo al código], la sección anteriormente citada no puede, por implicación, dar al acusado el derecho de pedir un jurado en una causa promovida por libelo. El simple hecho de que se haga esa cita, no contradice a la ley del jurado, puesto que hay que interpretarla en el sentido de que, siempre que en adelante se disponga que las causas promovidas por libelo sean juzgadas por un jurado, dicho jurado tendrá el derecho de determinar la ley y los hechos. En el caso de que el derecho a un juicio por jurado, fuere hecho extensivo a los acusados en causas por *misdemeanor,* o si el delito de libelo fuese declarado *felony,* entonces podría aplicarse esta sección, pero mientras no se hagan estos cambios en las leyes, dicha cita no puede tener la fuerza o efecto que se trata de darle por el peticionario en. este caso. Ciertamente, bajo ningún punto de vista de la causa pudiera haberse concedido un jurado al acusado en el juicio en que fue declarado culpable." ▪

Para las fechas en que se cometió el delito y se celebró el juicio la situación jurídica era similar a la que existía cuando fueron resueltos esos casos: el delito imputado era un delito menos grave, del conocimiento del Tribunal de Distrito, último sucesor en las funciones judiciales de las antiguas cortes municipales y únicamente existía el derecho a ser juzgado por jurado en los casos graves cuyos juicios entonces se celebraban en el Tribunal Superior. **Nuestro sistema judicial,** por hoy, impide la vigencia y aplicación efectivas de los artículos 246 y 264. Como lo insinúa el peticionario, el problema debe tener solución legislativa, no judicial.

El peticionario finalmente plantea en su alegato la severidad de la pena de 90 días de cárcel y nos pide que de confirmarse el fallo se le imponga como pena el pago de una multa con la alternativa de cárcel de no pagarse. Al efecto nos dice:

"Entendemos además que imponer a un ciudadano noventa días de cárcel por el hecho de repartir una hoja suelta constituye un castigo cruel e inusitado y no guarda adecuada, pro-

porción con el delito cometido, de determinarse que se cometió algún delito.

" . . . muy respetuosamente suplicamos al Hon. Tribunal Supremo de Puerto Rico que hechas las determinaciones de rigor en relación con los planteamientos de derecho señalados en este alegato, se pesen las circunstancias en las cuales se produjeron los hechos que han dado margen a esta denuncia y analizadas las mismas, de no proceder las cuestiones de derecho planteadas, entendemos que en el ejercicio de su discreción y facultades ese Hon. Tribunal Supremo de Puerto Rico, ordene la reducción de la pena impuesta al acusado."

El Procurador General no se ha manifestado ni a favor ni en contra de esa solicitud.

Por disposición expresa del artículo 364 del Código de Enjuiciamiento Criminal tenemos autoridad para modificar las sentencias condenatorias apeladas. En numerosos recursos, tomando en consideración las circunstancias concurrentes en cada uno, hemos ejercitado esa facultad en la forma que nos ha parecido más justa.

En este caso la prueba de El Pueblo no demostró la existencia de otros hechos cometidos por el denunciado, fuera de la simple repartición de la hoja suelta, que pudieran considerarse como factores agravantes en la comisión del delito. *Creemos que debe modificarse la pena impuesta sustituyéndola por una multa de cincuenta dólares, o, en su defecto, un día de cárcel por cada dólar que se deje de satisfacer. Deberá modificarse en ese sentido la sentencia recurrida, y así modificada, confirmarse.*